Oral argument not to exceed 15 minutes per side. Ms. Miller, you may proceed for the appellant. Thank you very much. Good morning, your honors. Good morning. How are you? Very fine. Welcome to Detroit. I hope you enjoy your stay while you're here. Thank you.                May it please the court, Racine Miller on behalf of the plaintiff appellant. This is a case that asks whether jail officials may avoid trial under Farmer v. Brennan when they house a mentally unstable detainee in a cell that contains a known ligature hazard, leave him unmonitored, and then when he uses the hazardous item to kill himself, claim that they lacked subjective awareness of the risk. The answer is no, because in this case, the detainee's death resulted from deliberate choices in the face of known risks. The jailers knew how inmates harm themselves. They had a policy to remove shoelaces and belts, but they gave him the very instrumentality of harm with which he took his life. At a minimum, a reasonable jury could find deliberate indifference on this record. I'm sorry. I meant to reserve three minutes. You're good. Thank you. The district court did err by resolving that question as a matter of law. First of all, the summary judgment standard was misapplied. The court viewed the evidence in a light more favorable to the defense rather than the non-movement and impermissibly drew inferences in favor of the defense rather than the non-movement. Most of our cases suggest that this is a very demanding standard, at least if we're in the farmer context for suicides. We have language to suggest that the mere possibility of suicide or even a likelihood of suicide is not enough and that there has to be a strong likelihood that the particular inmate will commit suicide. Usually, that strong likelihood exists if there's some indication in the record that the inmate is suicide prone, such as having prior attempts or conveying that he was suicidal. That type of evidence just doesn't exist in this case. That's correct. This is not that kind of case. This is not whether or not he was obviously suicidal. It's whether or not there was an obvious risk of harm that was known about and disregarded. It just so happened to be it was suicide. Your position is that every jail in America, if they have anything from which a person can harm themselves, no matter how not suicidal that person is, you can face liability? No, sir. It's still got to be obvious. In this case, arguably, it was. You're saying an electric cord fan is obvious. Yes. Any cord in any jail in America is enough? If it's something that they prohibit as contraband, such as shoelaces or belts, and it's a similar thing, yeah, it's policy. You don't leave them in a room with a cord. What's the case that says you've got to eliminate everything for everybody? You don't have to have a case that says that. It's just got to be obvious. In this case, it is. There are myriad factors about the obvious. Not only did you have a gentleman that was mentally infirm in the beginning, and they knew that. There was something wrong with him. He didn't appear to be quite right. That's casting a pretty broad net to say everyone that has a mental challenge is suicidal. That's quite unfair. We're not saying he's suicidal. If you couple that with the fact that they knew there was a cord in the room, they knew it was a dangerous room to put him in, and they put him in anyway. There was a voluntary override. When they did the intake, they pressed a button and said, you know what? A KPS room, we're going to hold him in there because the detox and the suicide-proof cell is unavailable to us right now, and we don't want to wait for maintenance. They elected. They made the voluntary choice. Your arguments, as I understand the farmer standard, there's the knowledge component, a strong likelihood that they have to know of a strong likelihood of suicide, and then there's the response component that you have to have acted unreasonably to ameliorate that risk. All of your arguments are quite good on the amelioration point. Yeah, they were negligent if they knew he was suicidal to put him in this room. I would grant you that, but I still think you have to satisfy the strong likelihood that he will commit suicide. You're arguing about a point that I find quite irrelevant to the point that I think is most concerning for your case. Okay. I'll try to redirect. Would you prefer to have information about how the, under farmer, subjective knowledge may be inferred? Yeah, I would agree with that. Okay. Typically we find inferences when the person says on admission into the jail that they're suicidal or some evidence like that. That's the evidence that I find lacking. Okay. Evidence. Yep, I agree. That evidence does not exist here. There were some phone calls that the gentleman had with his criminal defense attorney. Remember, he's a pre-trial. You would agree that those are only in the complaint and those calls are not in evidence? Correct. We did not attach the audio. Those calls are irrelevant. Okay. So let's not talk about them. And I will agree with you that he didn't tell anybody on intake, hey, I'm going to hurt myself if you don't stop me. That's true. That is a fact. But on these facts in this case, a jury could reasonably conclude that the officials and each of them knew because they have a policy that courts pose a suicide risk. Nonetheless, they disregard. Now you're back to the other point. Yeah. But Judge Murphy was trying to help you that, you know, you got to talk about why the inference is of a true suicide risk. And I think your best one so far is mental health challenges. And I think you got to connect that to a case or show these are the kind of mental health challenges that show a likelihood. Thank you. There are three factors here that under Farmer, we still get there. He doesn't have to say, I'm going to kill myself, you better look out for me. That doesn't have to happen here. We have three completely different independent factors. We've got the mental instability indicator. They knew he should have been in the room that they couldn't, the door was messed up. So they didn't put him there. And they didn't put him in any alternative safe housing. They put him in a room where they knew there was a hazard. So they got the environmental hazard. You've got the mentally infirmed gentleman. And third, which is also glaring in this case, is there was affirmative monitoring breakdown. I think it was Doug Roberts who was a desk officer. And he was assigned to be monitoring the live feed. This gentleman was intentionally, deliberately taken in his condition of the microwave razor coming at me. Something was wrong with him. And a conscious decision was made by Gerald Waldrop, the intake deputy, to go ahead and hit the button. You know, this is broken. We don't want to wait for maintenance. We're going to put him in this room that has a cord that's not meant to house people that contains a ligature hazard. They knew the hazard existed. They take shoelaces and belts away from everybody, not just suicidal ideation, but everybody because they know itself is a hazard. So they left him in the room with the hazard. And he fashioned the ligature, hung himself, and died all on camera while no one was watching. There was a conscious decision made to not observe the live feed. It was Douglas Roberts who was supposed to have done it. Instead, he decided to peek around the corner, not help, but look and see what the other guys were doing while they waited for maintenance. They didn't want to wait long enough. What do you do with the deputy, Deputy Hazenberg, I guess? You don't want to kick anybody from this case, but he actually got to the jail 15 minutes after Mr. Blibin committed suicide, so it's very difficult for me to see that he could have been the cause of the suicide since it had already happened before he took any action for which you seek to hold him accountable. My recollection was that Hazenberg came last, and he came while the door was being fiddled with, but that he was derelict in his duty to first do his rounds. But even if the suicide had already happened, if I'm recalling the record correctly, it was like at 2.30 and he got there right around 2.40 or something? I don't think that's the case. It is the case? Would you agree that that claim would fail? If Hazenberg showed up after the suicide, yes, he would be out. Absolutely. Absolutely. In any event, circumstantial evidence is permitted under Farmer. That's where we are. I understand what you're saying about generally the need for direct proof about a subjective belief of a detainee attempting suicide, but that's not necessary here because there were clear known hazards, and there was an absolute failure on three different levels. You even had the jail administrator who actually diverted the people that were charged with looking after Mr. Blevin and said, watch, come over here and work on the door. That's inappropriate. You can't take off your jailer hat and put on the maintenance man hat when you've got a maintenance man on the way. Yeah, all negligence. All types of negligence, yes? Thank you, sir. I wanted to talk briefly about Lawler and how it doesn't control because it was a materially different record. Here we've got contemporaneous delusions. We did have a suicidal statement that we won't talk about now in accordance with Judge Murphy, but there were also the known environmental hazards and the known monitoring failure. Lawler does not control in this case. There was a sparse record, and here we've got a stacked risk record. It's not hindsight. All of the dangerous risk factors were known before the event. Mondale liability is available here. Kenton v. Harris says that you can have a one-incident liability, and under these circumstances, that's absolutely appropriate. Single-incident liability is and can be and should be in this case based on an obvious risk coupled with a predictable consequence. The very purpose of the policy to refrain from allowing ligatures is so that they won't harm themselves, and they put them in a room with the means of harm and say, don't hurt yourself, absolutely unreasonable, absolutely reckless, absolutely preventable. Qualified immunity doesn't apply. Even though there were no direct communications of suicide from the decedent to each defendant, we are relying on the circumstantial inference here based on the cumulative indicators, obviousness, and the institutional knowledge. This case fits squarely within farmer's framework. It does not expand on it. The inference of knowledge here is exactly what farmer permits when the risk is obvious, and this was preventable. A jury should decide whether it was unconstitutional. All right, we'll get you full rebuttal. Thank you very much. Thank you very kindly. Thank you. Morris. Good morning, Your Honors. My name is Gus Morris. I represent the Ontanagan Sheriff's Department and the Deputy Corrections Officer sued in this matter. We are asking that you affirm Judge Fermat's decision granting summary judgment to these individuals. I'm pleased to see that we have settled upon what law applies to this case. I intended to start my argument out by saying what law applies, should it be farmer or the post-farmer Kingsley decisions. I think we've all now agreed that farmer is the controlling law in this case because of the time frame it happened. So with that in mind, to what Judge Murphy was saying, that case tells us that there must be objective evidence of a strong likelihood that someone would commit suicide in order for the first prong of farmer to be satisfied. Now, let's look at the facts of this case as it applies to that principle. This gentleman was arrested for shooting weapons by, not by our department, by the Michigan State Police and brought into our jail on Saturday, March, I'm sorry, May 22nd at approximately 320. Remind me, was this a fan cord? It was a fan? Yes, absolutely. They don't have cordless fans? Is that what's going on? I mean, I assume the fan is a benefit to the inmate. So is that the problem? Well, this was what, it's been called a capious room. The corrections officers will tell us that it's a day room. It typically was used for female inmates. Got all that. I'm just asking, why the cord? Well, there was a... It's a modern world. It was never asked, Your Honor. I'm sure it's probably been there for a long time before. There may have been cordless fans. I don't know. There's a TV there, too. It has a cord as well. Should it have been a cordless TV? I don't know. There are, as we know, there are points from which you could suspend yourself. There are sheets in there. I've had a lot of jail suicide cases where they rip off a piece of the sheet and tie it around a bar or something to anchor it to. So I'm not sure that just because there's a cordless fan versus a corded fan versus a cordless fan makes any difference because something else could have been used. But, again, back to the farmer's stand. What do we do with the fact that Officer Waldrop did express concern about his mental stability because of his comment about concerns with, I forget exactly what it was, radio microwaves? Yeah, he claimed that the microwaves were influencing his decisions. Does that... Well, I would say that quite a few of the people that are admitted to any jail across the nation sometimes have some sort of delusions or mental instability. So just the fact that this gentleman was talking about radio waves doesn't have anything to do with the fact that he might kill himself. Just like as part of the record, he was admitted for a mental health evaluation earlier that year in January, and he was seen by qualified psychologists every day and was interviewed. And we subpoenaed those records. They're part of the record below. On one of those 21 days when he was admitted, was there ever any indication by the professionals that this gentleman had suicidal tendencies or ideations? In fact, specifically for each day that he was evaluated, not suicidal was checked, and he never once complained about suicidal thoughts. He complained about some mental problems. His wife had died two years before. But he denied being upset about those things when Waldrop interviewed him. So some form of mental instability doesn't get you to a strong likelihood that someone was going to commit suicide. That would be our point with respect to that. I think the other thing to keep in mind is, as I was saying, he was booked into our jail on Saturday afternoon. He was checked hourly by the corrections officers. He did not commit suicide until Wednesday afternoon. He passed away, as you indicated, at 2.15 p.m. Hourly checks, is that routine for everybody? Well, it's a pretty small jail, Your Honor. Let me finish the question. I'm sorry. Are hourly checks routine for everybody, or are they only for people that have risk profiles? I think the deputies testified they do rounds hourly. For everyone? For everyone, yes. And if you understand the layout, obviously we don't have that here of the Ontonagon County Jail. It's very small, as you might imagine. The actual room where he was placed is about 20 feet away from the office where the TV monitoring screens are, and then just down the hall from there is the general portion of the jail. So you literally could... Not knowing this, but you said I would imagine that it's small. Is this a small town? I don't know. Oh, I'm sorry. It is in Judge Vermette's decision. In one of his footnotes, he indicates that Ontonagon County has a population of approximately 5,000 people. It's the third smallest county in the state of Michigan. Is it the upper peninsula? Where is it? Yes. So you know where Marquette is, obviously. It's two hours west of Marquette, near the Porcupine Mountain National Park there, or state park, right on Lake Superior shoreline. So last time I was there, they had about 10 feet of snow. It's really bad. Anyway, small is the point of all that. So he was checked on for that whole period. Not once did he say, I'm not feeling good, Depp. I'm thinking about killing myself. I'm having mental problems. And we saw him every hour. And over that four-and-a-half-day period, not once did he make any complaints to anybody at the sheriff's department that he had somehow was upset or was contemplating suicide or even asked for medical treatment. Had he asked for medical treatment, I think we might have an obligation to give it to him. Nothing during that entire period of time. And so I just don't see how on this record there's any ---- Why do you need a fan that far north? Well, that's a fair question. It was addressed. That's a fair question, Your Honor. I'll tell you. This occurred in May. And the sheriff, well, the sheriff testified. Exactly. I think it snowed up there last night, too. The sheriff testified that they do not have air conditioning in this jail. It doesn't exist. And so ---- The issue is heat. What? The issue is heat. Well ---- Who cares about air conditioning? Well, the reason ---- Well, no. The fan was in there because the jail gets really hot during the summertime. Does it really? Right. And so they put a fan in there to accommodate, you know ---- I don't think it got to be above 60 degrees ever. Oh, yeah. But anyway, I've got to learn a little more. Yeah, that's right. So that's why it was there, no air conditioning, and it would get very hot in the jail during the summertime. Or even in May, it can be hot in Ontanaga in May. All right. And so no behavior in that five-day period that would suggest a strong likelihood. And I think the case law is also clear that general anxiety that someone expresses about being arrested or incarcerated is not enough to get us to the strong likelihood element. So I think you can affirm Judge Vermette on that objective prong. And interestingly enough, he plainly argued that it was the Brawner decision that controlled, but even that standard still requires that there be objective evidence of a strong likelihood. And so Judge Vermette analyzed this matter under that prong as well. And even if you want to say that there was a strong likelihood just for the sake of discussion, the next element of Pharma tells us there has to be a subjective element. So that means that the officers, the corrections officers, must have drawn the inference that this gentleman was strongly likely to commit suicide and then consciously disregarded that. And I don't see how anything in this record gets you to the subjective prong on the part of these individuals. Don't you think it turns on the subjective prong, though? So if they actually had subjective knowledge, that their response to the strong likelihood of suicide would have been quite irresponsible. We'd be arguing a different case, I think, Your Honor, if that in fact were the action. I wouldn't be making some different arguments about what it is that they specifically did. Although I would say to you that if they in fact did decide that there was a strong likelihood he would commit suicide, he would have never been admitted to the jail. They probably would have referred him back to the UP Health Clinic for a psychiatric evaluation, which they had done in the past. So that's maybe even evidence that they didn't have that subjective element because they didn't make that decision to do that. And I wanted to address what Your Honor said about Deputy Hasenberg. He was not arriving for a shift, as they say in their brief. He was a road patrol officer, and he came in off the road at 2.30 when they were working on the door. And clearly from the video evidence, Mr. Blivens expired at about 2.15 that afternoon. So he was already deceased by the time they got there. And with respect to the cell checks as well, Deputy Clinesmith went to the cell where Mr. Blivens was housed and spoke to him at 2.09, so that's six minutes before he died, and explained to him that we're going to be over here with a grinder working on the detox cell door because it won't close, so it's going to be really loud. And Mr. Blivens responded, do whatever the heck you want. It's your jail. And so we actually saw him face-to-face and had a conversation with him six minutes before he expired. So you really can't say that we didn't check on him. And that concludes my argument. Without any further questions? No, I think we understand your position. Thank you. Appreciate it. Thank you very much. Ms. Miller, I think you have some rebuttal. Thank you. Thank you very much. I would just like to reemphasize this is not about a speculative risk. This is not about whether or not this guy jumped up and said I might hurt myself, take extra care of me. This is about a series of known risks of significant harm. And you're saying, well, he denied suicidality and intake form. That might be one of the things that Judge Murphy was trying to highlight. But the question here is what did officials know from the totality of the circumstances? They knew there was something wrong with him. They knew they had a duty and obligation to do the live monitoring. They had the ability to do so, and they failed. They knew that a prisoner can and is likely to harm themselves if you leave them alone with a ligature, and they left them alone with a ligature. Then they started grinding on the door in derogation of their duty to keep an eye on this fellow. So they couldn't have heard anything. They chose not to see anything, and unfortunately this was preventable. They had, if you look at the totality of the circumstances, absolute knowledge that this was a risk that they deliberately ignored. They had full knowledge of what could have happened, and unfortunately it did. No questions? We understand your position. Thank you very much. Thank you very much, all of you. Thanks to both of you for your helpful briefs and oral arguments, and for answering our questions, which we always appreciate. The case will be submitted, and the clerk may adjourn court.